ADAMS-MARQUETTE ELECTRIC COOPERATIVE, INC., Appellant, v. PUBLIC SERVICE COMMISSION, Respondent. [Case No. 304.]

MADISON GAS & ELECTRIC COMPANY, Respondent, v. PUBLIC SERVICE COMMISSION, Appellant: WISCONSIN POWER & LIGHT COMPANY, Intervenor-Appellant: CITY OF MADISON, Intervenor-Respondent. [Case No. 355.]

*Nos. 304, 355. Argued June 4, 1971.—Decided June 29, 1971.*
(Also reported in 188 N. W. 2d 515.)

720

722

For the appellant there was a brief by *Wheeler, Van Sickle, Day & Anderson* of Madison, and oral argument by *Floyd E. Wheeler.*

For the respondent the cause was argued by *William E. Torkelson,* chief counsel, with whom on the brief was *Robert W. Warren,* attorney general.

For the intervenor there was a brief by *Eugene O. Gehl, Griffin G. Dorschel,* and *Petersen, Axley, Brynelson & Herrick,* all of Madison, and oral argument by *Mr. Gehl.*

For the appellant the cause was argued by *William E. Torkelson,* chief counsel, with whom on the briefs was *Robert W. Warren,* attorney general.

For the intervenor-appellant there were briefs by *Petersen, Axley, Brynelson & Herrick,* and oral argument by *Eugene O. Gehl,* all of Madison.

For the respondent there was a brief by *Stafford, Rosenbaum, Rieser & Hansen* of Madison, and oral argument by *Willard S. Stafford.*

For the intervenor-respondent there was a brief by *Edwin Conrad,* city attorney, and *William A. Jansen,*

principal assistant city attorney, and oral argument by *Mr. Jansen.*

WILKIE, J. As to case No. 304, appellant, Adams-Marquette Electric Cooperative, Inc. (hereinafter A-MEC), is a co-operative organized under ch. 185, Stats., and is engaged in the distribution and furnishing of electric service to its members. Its principal service area is in Adams and Marquette counties. As of the time of the hearing before the Public Service Commission here, it was the only supplier of electric service to consumers within the town of Lincoln in Adams county.

The intervenor, Wisconsin Power & Light Company (hereinafter WP&L), is a public utility. At the time of the PSC hearing, WP&L did not supply any electric service to any consumer within the town of Lincoln, nor had it ever been authorized by the commission to do so.

One of A-MEC's customers (and members) was George Hornek, now deceased, who owned two parcels of land in the town of Lincoln. One parcel consisted of 120 acres in section 8 (the southeast quarter of the northwest quarter, and the east half of the southwest quarter). His residence and other farm buildings were located on the southeast portion of this parcel. The second parcel of land consisted of 80 acres in section 17 (the west half of the northeast quarter). The two parcels are divided by County Trunk "M" but are not directly across from each other. Appellant supplies electric service to the residence and other buildings located on the parcel in section 8; no electric service of any kind had ever been provided to the parcel located in section 17.

Lakehead Pipe Line Company (hereinafter Lakehead) has constructed a 34-inch oil pipeline extending in part from Superior, Wisconsin, southeastward to the Wisconsin-Illinois state line. A portion of this line crosses section 17 in the town of Lincoln, including the land previously owned by George Hornek.

On July 16, 1968, Lakehead purchased a parcel of land from Hornek on which to construct a pumping station. This parcel is located in section 17, and consists of approximately seven and one-half acres. The pumping operation will require a substantial amount of electric power. The initial installation will consist of two 2,500 h. p., and one 1,250 h. p., four 160-volt three-phase electric motors; the ultimate installation will consist of four 2,500 h. p. motors. The motors will start on full voltage and will require special transformers designed to minimize voltage drop. The number of "starts" per day is estimated at two per unit and may occur at varying times through a twenty-four-hour period, depending on the delivery requirements of the line. Electrical service for the pipeline was required by October 15, 1969.

The electric service required by Lakehead would of necessity require a primary voltage extension; it could not be made available from the facilities of any public utility or co-operative through a secondary voltage extension. In addition, no electric utility or co-operative has facilities within 500 feet of the pumping station site from which the requested service could be provided.

On October 31, 1968, Lakehead applied to WP&L for service to its pumping station, detailing its service requirements. A-MEC "heard" of this but assumed that it would serve the pumping station since Lakehead was a member of the co-operative and was receiving service elsewhere at two locations on its pipeline for operation of demagnetizing devices. When appellant's manager wrote Lakehead on February 10, 1969, however, inquiring as to Lakehead's requirements, he was informed that Lakehead had already applied to WP&L because of the proximity of the latter's 69-kv transmission line and the service requirements of the pumping station. On April 14, 1969, Lakehead contracted with WP&L to supply the necessary power to operate the pumping station. On May 5, 1969, A-MEC filed with the commission an

application for declaratory ruling. A hearing was held on July 3, 1969, and on October 3, 1969, the commission concluded:

"That the electric service required by Lakehead Pipe Line Company, Inc., for [its] oil pumping station . . . may lawfully be furnished by either Wisconsin Power & Light Company or Adams-Marquette Cooperative."

On the same date the commission issued its certificate of authority to WP&L to:

". . . operate as an electric public utility in the town of Lincoln, Adams county, and that it construct an electric line and a substation in section 17 of that town . . . ."

After the commission denied its various motions to reopen and rehear the matter, A-MEC sought review by the circuit court for Dane county. That court affirmed the determination made by the commission. From its judgment to that effect A-MEC appeals.

The first issue presented in this case is whether the commission erred as a matter of law in permitting WP&L to serve the Lakehead pumping station.

There is no dispute that the findings of the commission were supported by substantial evidence. Specifically, appellant asserts that the commission erred as a matter of law in applying sec. 196.495 (1), Stats., to the instant case. The immediate dispute is focused on the meaning of the phrase "premises of any person already receiving electric service" in sec. 196.495 (1) (a). The commission expressly determined that the pumping station:

". . . does not constitute a part of the premises of a person already receiving electrical service from [appellant] within the meaning of sec. 196.495 (1), Stats."

As the trial court noted, the statute is ambiguous as it applies to the instant case (No. 304). For example, the statute might be construed in favor of appellant since

Lakehead was already receiving electric service from appellant at other locations, *i.e.,* Lakehead is a *"person* already receiving electric service." This literal reading of the statute would mean that wherever Lakehead went, only appellant could supply it with electric service. Similarly, every time the property changed hands, a different utility or co-operative might serve the "premises." This construction was rejected by the trial court as creating an absurd rule, and properly so.

An alternative reading of the statute is that it is the *"premises"* which is "receiving electric service." Hence, the question becomes whether that portion of land on which Lakehead's pumping station is located is a "premises . . . receiving electric service" from appellant. The commission held it was not; the trial court affirmed, deferring to the expertise of the commission and noting also that the overriding purpose of the statute is protection of the consumer.[1]

Clearly the word "premises" has varying definitions and its meaning is properly determined only with reference to its context. In this case, the context should include not only the statute itself, but the purpose of the statute, and prior decisions of this court. The reasonableness of the commission's construction must also be considered in the factual context of the particular case.

As the trial court observed:

"The case at bar calls upon someone to make a choice whether the 7½ acres to be served may be called 'the premises of any person already receiving electric service.' The matters to be considered in making the choice must include consideration of the purposes of the statute, the facts of the instant case and the practical aspects of the case, such as the location of the land to be served in relation to the lands already being served, the availability of adequate service.

[1] *Wisconsin Power & Light Co. v. Public Service Comm.* (1969), 45 Wis. 2d 253, 172 N. W. 2d 639.

"The primary concern of the commission and the court is the protection of the consumer rather than the competing electric companies, either utilities or cooperatives. . . ."

To these factors should also be added the nature of the service to be provided, and its relation to that previously provided, as well as changes in ownership and use.

The commission's determination in this case required the application of the phrase "premises of any person already receiving electric service" to the particular facts as found by the commission. The scope of review in such a case, both by the circuit court and by this court, is set forth in *Milwaukee v. Wisconsin Employment Relations Comm.*[2] That case involved a dispute as to whether attorneys employed by the Milwaukee city attorney's office were "municipal employees" within the meaning of sec. 111.70 (1) (b), Stats. After concluding that the statutory definition should not be read literally, this court discussed the scope of review:

"Sec. 227.20 (1), Stats., provides that an administrative agency's decision may be reversed or modified by the circuit court:

" '. . . if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions or decisions being:

" ' . . .

" '(b) In excess of the statutory authority or jurisdiction of the agency, or affected by other error of law.'

"This court has previously held that its scope of review is

" '. . . identical to that given to the circuit court by sec. 227.20, Stats.' *Scharping v. Johnson* (1966), 32 Wis. 2d 383, 389, 145 N. W. 2d 691.

"In *Pabst v. Department of Taxation* (1963), 19 Wis. 2d 313, 120 N. W. 2d 77, 5 A. L. R. 3d 594, this court pointed out that there are two methods of reviewing an administrative agency's application of a statute to certain facts. The first method is the analytical approach whereby the court decides which part of the agency's determi-

---

[2] (1969), 43 Wis. 2d 596, 168 N. W. 2d 809.

nation presents a question of fact and which part a question of law. The second method is the practical or policy approach which avoids allocating labels of 'fact' or 'law' to the agency's determinations. When the practical approach is used, judicial review is exhausted if there is found to be a rational basis for the conclusions approved by the administrative body.

" 'We believe that pars. (b) and (d) of sec. 227.20 (1), Stats., require Wisconsin courts to employ the analytical approach when reviewing agency decisions. Nevertheless, in fields in which an agency has particular competence or expertise, the courts should not substitute their judgment for the agency's application of a particular statute to the found facts if a rational basis exists in law for the agency's interpretation and it does not conflict with the statute's legislative history, prior decisions of this court, or constitutional prohibitions.' *Pabst v. Department of Taxation, supra,* at pages 323 and 324.

"There can be no doubt that the question presented in this case is one of 'law.' In decisions even more recent than the *Pabst Case,* this court has further discussed its obligation in reviewing an administrative agency's interpretation of questions of law.

" 'The supreme court is not bound by an administrative agency's construction of a statute. . . .' *National Amusement Co. v. Department of Revenue* (1969), 41 Wis. 2d 261, 274, 163 N. W. 2d 625. *See also: Johnson v. Chemical Supply Co.* (1968), 38 Wis. 2d 194, 156 N. W. 2d 455.

"However,

" '. . . the construction and interpretation of a statute adopted by the administrative agency charged with the duty of applying the law is entitled to great weight. . . .' *Cook v. Industrial Comm.* (1966), 31 Wis. 2d 232, 240, 142 N. W. 2d 827. *See also: National Amusement Co. v. Department of Revenue, supra; Chevrolet Division, General Motors Corporation v. Industrial Comm.* (1966), 31 Wis. 2d 481, 143 N. W. 2d 532.

"This court does not independently redetermine every conclusion of law made by an administrative agency.

" '. . . If several rules, or several applications of a rule are equally consistent with the purpose of the statute, the court will accept the agency's formulation and application of the standard.' *Milwaukee Transformer Co. v.*

*Industrial Comm.* (1964), 22 Wis. 2d 502, 510, 126 N. W. 2d 6.

"In applying the standards to this case, it should be noted that the application of the municipal employment law (sec. 111.70, Stats.) is one of the areas of the law requiring expertise. Therefore, the only determination this court should make is whether the WERC's interpretation of 'municipal employe' is consistent wtih the purpose of sec. 111.70." [3]

On review, then, we must decide whether the Public Service Commission's formulation and application of its construction and interpretation of sec. 196.495 (1), Stats., was reasonable under all the circumstances of this case.

In the recent case of *Wisconsin Power & Light Co. v. Public Service Comm.*, *supra*, this court held that while one of the main purposes of the law is to avoid duplication, "the predominant purpose underlying the public utilities law is the protection of the consuming public rather than the competing utilities." [4]

Given this overriding purpose of the statute here involved, it cannot be said that the application of sec. 196.495 (1), Stats., to the particular facts of this case is unreasonable in that it is inconsistent with the purpose of the statute or prior decisions of this court interpreting it. This is especially true when the following findings of the commission (which are not disputed) are considered:

"9. Adams-Marquette has a 7.2/12.4-kv., three-phase electric line along the north and east sides and a 7.2-kv. single-phase line along the south side and a portion of the west side of section 17, town of Lincoln, Adams county. . . .

"  . . .

"16. . . . [WP&L] does not at present serve customers in the town of Lincoln, but its 69-kv. Wautoma-Castle Rock electric transmission line transverses the town in a generally east-west direction and crosses section 17 approximately one-half mile south of Lakehead's pump

---

[3] *Id.* at pages 599–601.

[4] *Supra*, footnote 1, at page 259.

station. This line, approximately 36 miles in length, is presently not sectionalized and is tapped at three points which gives 52 miles of exposure without sectionalizing facilities.

"17. To serve Lakehead, W. P. & L. would sever the 69-kv. line south of the pumping station and construct approximately 0.7 mile of double circuit 69-kv. line to a 69/4.16 substation to be constructed on the pump station site. Oil circuit breakers will be installed at the substation for sectionalizing purposes which will allow power to be supplied to the pumps in the event of failure of either section of the line. This *will improve the service to those now served from the line and reduce the length of line exposure between sectionalizing points.*

"18. *Adams-Marquette had no definite plan for serving the pumping station.* It anticipated having W. P. & L. tap W. P. & L.'s 69-kv. line at some point near the station at or near which point it would construct a substation in which it proposed to install either a portable substation, owned by Dairyland Power Cooperative, or such used transformers as it could obtain until transformers of the proper electrical characteristics could be purchased. The record indicates that standard transformers might not provide proper pump starting and operation.

"19. It would not be practical for Adams-Marquette to arrange to provide the service in the same manner as proposed by W. P. & L. because this would involve foreign operation of W. P. & L. facilities." (Emphasis added.)

When these findings are considered along with the other findings we have previously noted, especially the need for service no later than October 15, 1969, that neither party had facilities within 500 feet of the pumping station site, and the application by Lakehead for service from WP&L based on its view of its needs and the capabilities of each to service them, the commission's determination that *either* could service Lakehead's pumping station cannot be said to violate the purpose of the statute. It is a reasonable application of the statute under the particular facts. While appellant's view of the statute

may be reasonable, it does not render the commission's interpretation unreasonable. Therefore, the circuit court's decision affirming the commission's determination should be affirmed.[5]

In this case a second issue is raised by appellant as to whether the Public Service Commission's action in authorizing WP&L to serve the pumping station and to construct facilities necessary to provide such service was arbitrary and capricious.[6]

On October 3, 1969, the commission granted WP&L's application to construct facilities in section 17, town of Lincoln, to service the Lakehead pumping station pursuant to its plan outlined in the commission's findings. It acted on WP&L's application without a hearing.

A-MEC contends that the commission's action in issuing this certificate was "arbitrary and capricious."

The trial court's conclusions as to the merit of these contentions are appropriate:

"Petitioner has claimed but does not strongly argue that the commission should not have issued a certificate authorizing WP&L Co. to operate in town of Lincoln. . . . The authorization was the natural result of the determination that petitioner did not have the exclusive right to serve the $7\frac{1}{2}$ acres and the real issue was fully litigated in the case in which declaratory judgment was entered contrary to petitioner's contention. *No statute requires a hearing for issuance of the certificate.* The public interest was the sole concern of the commission before it issued the certificate. Under the circumstances we see no error in the grant of authorization. The lack of any substantial argument or brief by petitioner on this matter leads us to conclude that there is no substance to it." (Emphasis added.)

[5] *Milwaukee v. Wisconsin Employment Relations Comm.*, *supra*, footnote 2, at page 602. *See also: Chauffeurs, Teamsters & Helpers v. Wisconsin Employment Relations Comm.*, ante, p. 391, 187 N. W. 2d 364; *Milwaukee Transformer Co. v. Industrial Comm.* (1964), 22 Wis. 2d 502, 510, 126 N. W. 2d 6.

[6] Sec. 227.20 (1) (e), Stats.

There is no hearing requirement in sec. 196.49 (1), Stats., nor in the applicable rules of the commission.[7] In fact, the rules of the commission expressly provide for issuance of the certificate without a hearing:

"PSC 112.01 **Electric utility plant and equipment.**

" . . .

"(3) If upon consideration of the application, together with any supplemental information and objections, the commission shall be satisfied that the public convenience and necessity require the project as proposed, it will so find and certify without public hearing, . . ."

In its findings of fact accompanying this order issuing the certificate, the commission expressly found that the requisite "public convenience and necessity" existed. The commission's findings in the original declaratory action indicate that appellant's "plan" was not sufficient.

While the commission *may* have granted hearings in other cases, as noted by appellant, *there is no requirement that it do so.* In light of the full hearing on the matter originally and its findings therein, its decision that either party might provide service to Lakehead's pumping station, and the contract between Lakehead and WP&L, the commission's authorization was not "arbitrary or capricious."

As for appellant's contentions throughout that the commission's determination in the instant case is not consistent with its determination in other cases, *i.e.*, No. 355, "inconsistencies in determinations arising by comparison are not proof of arbitrariness or capriciousness." [8] More importantly, as the portion of this opinion concerning case No. 355 states, the commission's determination in that case was not reasonable.

As to case No. 355, the commission's findings of fact are also not in dispute. In summary these are as follows:

---

[7] 6 Wis. Adm. Code, sec. PSC 112.01.

[8] *Robertson Transportation Co. v. Public Service Comm.* (1968), 39 Wis. 2d 653, 661, 159 N. W. 2d 636.

Wisconsin Power & Light Company (hereinafter WP&L) intervenor-appellant here, is engaged in the distribution and sale of electric energy and natural gas to and for the public in certain areas of Wisconsin, including the town of Middleton, Dane county.

Respondent Madison Gas & Electric Company (hereinafter MG&E) is also a public utility engaged in the distribution and sale of electric energy and natural gas to and for the public in the city of Madison and in certain areas in the town of Middleton and other locations in Dane and Columbia counties. It provides electric and gas service in the city of Madison under an indeterminate permit.[9]

For many years WP&L (or its predecessor) has been providing all the electric service to the buildings on two farms located in the southwest quadrant of the intersection of Mineral Point Road and Gammon Road (formerly located in the town of Middleton and now in the city of Madison) : since 1918 to the Meyer farm, consisting of 77 acres and bordered by Gammon Road, and at least since 1942 to the Ganser farm, consisting of 265 acres, and located to the west of and immediately adjacent to the Meyer farm. In addition, from its 12.4-kv. line bordering the southwest quadrant of the intersection of Gammon Road and Mineral Point Road, WP&L has provided electric service to some 300 customers in that quadrant and in an area immediately west of Gammon Road.

MG&E also serves customers in the town of Middleton, and in the same general area here involved, *e.g.*, the James Madison Memorial High School in the northeast quadrant of the intersection of Mineral Point Road and Gammon Road, and a farm in the northwest quadrant of this intersection. MG&E has a power line bordering the northeast quadrant of this same intersection. In short, both utilities have provided service to customers in the

---

[9] Sec. 196.01 (5), Stats.

town of Middleton without boundary agreement or exclusive franchise or permit.

On September 28, 1967, the city of Madison annexed the Meyer farm to the city of Madison. The annexation ordinance was published October 5, 1967.

On December 15, 1967, the Meyer farm was purchased by the J. C. Penney Company. The east 500 feet of the Ganser farm (consisting of approximately 29 acres and immediately adjacent to the Meyer farm on the west) was also purchased by J. C. Penney Company on May 8, 1968. There were no buildings on this portion of the Ganser farm.

On July 11, 1968, the city of Madison annexed this 500 feet of the Ganser farm to the city of Madison. This annexation ordinance was published July 16, 1968. As a result, the entire parcel of approximately 100 acres purchased by the J. C. Penney Company was annexed to the city of Madison.

On September 24, 1968, the first public announcement was made of the proposed development of this 100-acre parcel. Until that time the area had been zoned and used for agricultural purposes. This announcement concerned the proposed West Towne Shopping Center to be located in the 100-acre parcel and stated that the developer would be an Ohio concern, and that although the developer had considered building an apartment complex in the area, no definite plans were announced. The West Towne project, as planned, occupies approximately 74 acres, covering essentially that area which was the Meyer farm. That area which was part of the Ganser farm is available for expansion.

The proposed project consisted of a central complex of three principal businesses (Sears, Roebuck & Company, H. C. Prange, and J. C. Penney Company), and four other buildings which would house approximately 50 smaller businesses. The seven principal buildings would be joined by an enclosed mall, with the smaller

businesses located in the center adjacent to the principal businesses, and in the mall.

By identical letter dated October 10, 1968, the developer requested electric service of both utilities. The letter stated, among other things, that construction would begin in the early spring of 1969, with opening scheduled for early fall of 1970.

On October 8, 1968, both WP&L and MG&E petitioned the commission for a declaratory ruling as to which utility should provide electric service to the West Towne complex. A joint hearing was held on November 19, 1968, and January 15, 1969, with the filing of briefs completed by March 19, 1969.

On July 25, 1969, the commission (by two to one vote) determined that WP&L was entitled to supply the service to West Towne since it had previously supplied service to the two farms which occupied the 100-acre parcel on which the complex would be located; that WP&L was entitled, under the facts and circumstances of this case, to the protection of sec. 196.495 (1), Stats.; and that MG&E was precluded, by sec. 196.495 (1), from extending electric service to or rendering electric service to West Towne. Chairman Arthur L. Padrutt dissented.

On October 6, 1969, WP&L filed with the commission an application pursuant to sec. 196.49, Stats., for authority to construct certain facilities necessary to provide the required service. WP&L set forth two proposals: (1) using only its own facilities at a cost of $1,385,210; or (2) using both its facilities and those of MG&E at a cost of $1,350,806 to itself and $17,000 to MG&E. After a hearing, the commission on January 5, 1970, authorized the second proposal.

In reaching its decision, the commission found that the advantages of the second proposal, *i.e.,* the immediate possibility of two-way service to West Towne, the reduction in the amount of overhead line, and the re-

duction of cost, outweighed the major disadvantage of this proposal, *i.e.*, the involvement of two utilities. Therefore, it concluded that "public convenience and necessity" required the adoption of the second proposal involving both utilities.

MG&E then sought review by the circuit court for Dane county. On October 16, 1970, Judge BARDWELL entered a judgment reversing the commission, holding that the commission "erred in its ultimate conclusion that service by MG&E to West Towne would be in violation of sec. 196.495 (1)." The court remanded the matter to the commission. It is from this judgment that the present appeal is taken. The Public Service Commission appeals from this judgment. (WP&L is intervenor-appellant.) MG&E has entered a notice of review. (The city of Madison is intervenor-respondent.)

The principal issue presented by this appeal in case No. 355 is whether the Public Service Commission's determination in this case involved a reasonable application of sec. 196.495 (1), Stats.

In reaching its decision, the commission made the following findings, in addition to those facts previously summarized:

"12. At time of the hearing (November 19, 1968) MG&E had a 4-kv. circuit along the north side of Mineral Point Road extending to Gammon Road, and thence north on Gammon Road to Middleton. From this circuit it supplies a city of Madison well and pumping station, the James Madison Memorial High School, and the farm in the northwest quadrant of the intersection of Mineral Point Road and Gammon Road. Generally speaking, the MG&E electric service area in this vicinity is east of Gammon Road and north of Mineral Point Road. It acquired said service area in this vicinity (including that in the northeast quadrant of the intersection of Mineral Point Road and Gammon Road) by acquiring facilities and territory from WP&L pursuant to voluntary agreement between it and WP&L approved by the Public Service Commission upon annexation of territory to the city of Madison pursuant to a policy followed by

WP&L in the past dependent on the facts and circumstances of each case which policy WP&L has declined to follow in the present case. The service area in the northeast quadrant of the intersection of Mineral Point Road and Gammon Road was acquired by MG&E from WP&L in 1962. WP&L continued to serve therein until May 4, 1962.

"13. WP&L has had a 12.4-kv. 3-phase circuit which runs east along the north side of Mineral Point Road to Gammon Road and thence south along the west side of Gammon Road, originally constructed as an 11.4-kv. line in 1918 and converted to 12.4-kv. in 1954. Generally speaking, it or its predecessor had for many years owned and operated facilities and provided electric service at various locations on both the east and west sides of what is now Gammon Road, and on both the north and south sides of Mineral Point Road and in the general area south of the Mineral Point Road and west of the Gammon Road, including service to the buildings at the Meyer and Ganser farms. At time of the hearing (November 19, 1968) WP&L served some 300 residential, commercial, and rural customers in the area west of Gammon Road from the aforesaid 12.4-kv. line. The electric service furnished the Meyer and Ganser farm buildings is from said line.

" . . .

"15. WP&L has held and now holds itself out to and has provided electric service to the area south of Mineral Point Road and west of Gammon Road including the 100-acre area in the southwest quadrant of the intersection of said highways proposed to be developed as the West Towne Shopping Center. Electric service has been provided in the past and if called upon in the future will be provided in accord with rules and rates filed by WP&L with the Public Service Commission of Wisconsin. WP&L has not consented in writing or otherwise to having service provided in said 100-acre area by MG&E.

"16. The electrical service requirements of the West Towne Shopping Center cannot be met by utilization of present facilities of either WP&L or MG&E adjacent to said area. Neither WP&L nor MG&E can provide such service by a secondary extension (one normally constructed and operated at a voltage not to exceed 600 volts). WP&L would continue to maintain its present 12.4-kv. circuit located adjacent to the West Towne Shop-

ping Center area in any event to serve approximately 300 residential, commercial, and rural customers now served by it to the west. The particular segment of the WP&L 12.4-kv. line at the shopping center site would be removed and replaced by an underground 12.4-kv. circuit.

"17. New facilities will have to be constructed to provide electric service to the West Towne Shopping Center by WP&L if it is determined that it shall provide service thereto, or by MG&E if it is determined that it shall provide service thereto. Each would provide service by a 69-kv. line to a substation to be located at or near the Shopping Center, from which underground facilities would provide service to the various enterprises to be located in the center. The 69-kv. line proposed to be constructed by MG&E would extend a distance of approximately 1½ miles from the Shopping Center substation site to a point of connection with its existing Fitchburg-Pheasant Branch 69-kv. line. The 69-kv. line proposed to be constructed by WP&L would extend a distance of about 6 miles from its Verona substation to the West Towne Shopping Center substation site. Subsequently it would extend a 69-kv. line from the latter point to its Cross Plains substation, a distance of about 7 miles, so as to provide the Shopping Center with an alternate source of electricity. The total cost of the two WP&L lines will approximate $290,000."

Based on all of its findings the commission concluded, in effect, (1) that WP&L had at all times provided electric service to the Meyer and Ganser farms and that the annexation of the portions of those farms which were purchased for the West Towne complex in no way "impaired its prior and existing obligation to serve" these farms; (2) that prior to annexation MG&E "did not hold itself out to serve in said respective areas nor have any obligation or right to serve therein;" (3) that any right or obligation of MG&E to serve this area after annexation is subject to sec. 196.495 (1), Stats.; (4) that WP&L, by serving the buildings on these farms, was serving the "premises" as used in sec. 196.495 (1); (5) that to allow MG&E to serve the new West Towne complex would be a violation of sec. 196.495 (1). Therefore,

the commission concluded WP&L was entitled to serve the new West Towne complex.

The dissenting opinion of Chairman Padrutt reasoned that (1) the new shopping center was so completely different from the farm buildings that it constituted a new "premises" within the meaning of sec. 196.495 (1), Stats.; and (2) "the well-established rule that only *one* electric utility should serve in a given municipality" compelled the conclusion that MG&E should provide the service to West Towne.

On review, the circuit court found the dissenting opinion most persuasive. The court adopted the "building" concept of "premises," noting that WP&L had never provided any service to West Towne:

". . . In other words 'premises' meant some building, structure or station which was actually receiving electric service from a supplier when the competing utility or co-op sought to render a duplicate service."

In doing so it noted the commission's ruling in No. 304, *supra,* and in the *Pierce-Pepin Case.*[10] The court concluded its interpretation was consistent with that of the commission in case No. 304, and that, while not entirely consistent with *Pierce-Pepin,* the *Pierce-Pepin Case* presented "singular circumstances." The court then noted that, in its opinion, the commission's determination in the instant case was not consistent with its determination in either *Pierce-Pepin* or No. 304, *supra.*

The court felt that since the avoidance of duplication of facilities was a purpose of sec. 196.495 (1), Stats.,

[10] In this case a utility was providing electric service to the residence and other buildings on a farm. The owner of the farm then built a new home on his land 200 feet from his old home, moved into the new, and rented the old premises and the farm to another. The builder had procured electric service from a co-operative during construction. The commission held that the utility was already serving the "premises," consequently only it could serve the farm *and* the new residence.

the statute should be construed to prevent duplication of facilities in the same municipality, consistent with its view of the purposes of secs. 196.495 (2) and 196.50. It went on then to note that since both utilities served in the town of Middleton, MG&E would have the right to serve West Towne, and with annexation of the West Towne area to Madison where MG&E has an indeterminate permit, "it was only logical and proper that the utility serving the city be given the new service unless such action was clearly proscribed by sec. 196.495 (1)."

In its judgment, the trial court noted its memorandum decision and specifically provided: ". . . Petitioner Madison Gas & Electric Company has the right to render electric service to [West Towne]." In its judgment, the court remanded the record to the Public Service Commission for further proceedings consistent with the court's decision.

Further in its memorandum decision the court also noted that WP&L had "rather uniformly" agreed that areas in the town of Middleton which it served could be served by MG&E upon their annexation to Madison, and that after declaring that MG&E was precluded from serving West Towne, the commission approved a plan where WP&L would use some of MG&E's existing facilities to serve West Towne. The court felt that this commission decision manifested the unreasonableness of the commission's original determination that MG&E was precluded from serving West Towne.

In substance then, the trial court in its memorandum decision construed "premises" as used in sec. 196.495 (1) (a), Stats., narrowly to cover only buildings, etc., not the total area owned, and concluded the commission erred in its application of the statute since MG&E was not precluded from rendering service to West Towne. The court also held, in effect, that MG&E's indeterminate permit precluded WP&L from serving the shopping center.

The major question here, as in No. 304, is whether the commission's application of the statute is reasonable.[11] In reaching such a determination, many factors should probably be considered, among them:

1. The nature of changes in ownership and use of the "premises;"

2. The nature of changes in the service to be provided;

3. Utility of existing facilities;

4. Propinquity and economy of service.

To these, of course, must be added the overriding purpose of the public utility laws generally: protection of and benefit to the consuming public, and a primary purpose of sec. 196.495, Stats., in particular, the avoidance of duplication of existing service.

On this record, West Towne, the particular consumer, will not be particularly better served by one utility or the other. Whether the general consuming public will be was not determined.

As for avoidance of duplication of existing service, there is much that is persuasive in MG&E's argument that since the facilities of WP&L used to serve the two farms were not adequate to service West Towne, there could really be no duplication of service if MG&E served the shopping center. In other words, if the change in service requirements is so drastic as to require completely new facilities, a new utility would not be duplicating service previously provided by the old utility.

On the other hand, there is also much merit to WP&L's argument that it previously held itself out to serve the two farms, did so for many years, and as a public utility had an *obligation* to continue doing so. Given this obligation which it fulfilled, WP&L should not be ousted merely because the new use of these "premises" will now be much more profitable. In short, there is some value to

---

[11] *Milwaukee v. Wisconsin Employment Relations Comm., supra,* footnotes 2 and 5.

protecting the "area integrity" of a public utility who faithfully fulfills its obligation to serve the public in that area.

In any event, the following facts are not disputed:

1. Although the consumer will be adequately and reasonably served by either utility, neither can do so with existing facilities with which it now serves other consumers in the area.

2. There has been a change in ownership, and a drastic change in the use of the "premises."

3. Consequently, there has been a drastic change in the nature of the service required and to be provided.

(With the exception of adequacy of service to the consumer, these changes were also present in No. 304.)

As noted in No. 304, it would be an unreasonable application of the statute to hold that because Lakehead was receiving service at other locations from the cooperative, only the cooperative could provide Lakehead with service at any other location where it required service. The absurdity of such a reading of the statute was pointed out by Judge JACKMAN in that case, *supra.*

However, an inflexible interpretation such as that of the trial court in this case, *i.e.,* "premises" means only buildings, would be equally unreasonable. This would preclude the decision the commission reached in *Pierce-Pepin, supra,* which this same trial court approved. Similarly, if a farmer operated a 500-acre farm, on one area of which was his home and outbuildings which received service from one utility, the construction of a new building on another portion of his land would in theory not preclude another utility from serving this new building, even though the nature of the service was no different. While this might not be unreasonable under some circumstances, it clearly could be under others.

Nor is an inflexible "area" interpretation of "premises" any more proper. Suppose a farm of 500 acres consisting of several parcels, with buildings on one parcel receiving

service from one utility; then suppose another parcel of this farm were sold for a residential development or for use as a factory site. Is it reasonable to say only the original utility can serve this development or factory? This is essentially the situation presented by No. 304. But should the presence of some farm building on each parcel, including the parcel sold, in and of itself preclude another utility from serving? This could well produce unreasonable results.

The only material difference between these examples and the instant case, is that here the two farms each consisted of *one* large parcel. But should this, in and of itself, be controlling? It seems obvious that any attempt to inflexibly limit the term "premises" is improper.

However, mere change in ownership or use should not by itself be controlling, without consideration of the degree and nature of the change. For example, the fact that a large home is converted to a nightclub may not be sufficient to permit another utility to serve the "premises." The statute must be applied to the facts peculiar to each case, in light of the legislative purpose.

Given all of the facts, especially the drastic change in use of the 100 acres here involved, and consequently, the drastic change in the service to be provided, the commission's application of sec. 196.495 (1), Stats., to preclude MG&E from providing service is unreasonable. This is especially true when one considers that MG&E's providing the new service will not in any meaningful sense be a duplication of the service previously provided by WP&L to the two farms.

However, the trial court's determination, that only MG&E can provide service because of its indeterminate permit, is erroneous. The 1961 legislature rejected legislation which would preclude WP&L from serving this annexed area merely because of MG&E's indeterminate permit. Further, sec. 196.495 (2), Stats., clearly provides that the provisions of sub. (1) shall apply when a

utility (other than that having an indeterminate permit) is serving an area subsequently annexed after January 1, 1961. Hence, in the instant case, the mere fact of annexation does not in and of itself preclude WP&L from serving West Towne.

Further, the only issue before the commission was whether MG&E was precluded by sec. 196.495 (1), Stats., from providing service to West Towne. Because of its decision that MG&E was precluded, the matter of which *should* serve, if either were permitted to do so, was never considered. Therefore, since the commission's application of the statute was unreasonable, the matter must be remanded to it for further consideration and without any absolute direction that MG&E, as the utility serving the city, be given this service. In this case (No. 355) we decide only one issue: that MG&E is not precluded by sec. 196.495 (1) from providing service to West Towne.

On remand, the commission undoubtedly will consider other factors, among them (1) the annexation of the area; (2) construction requirements including convenience, cost, etc.; and (3) the benefit to consumers generally, whether served by MG&E or WP&L.[12]

*By the Court.*—Case No. 304: Judgment affirmed. Case No. 355: Judgment affirmed, cause remanded for further proceedings not inconsistent with this opinion.

---

[12] For example, in No. 304, consumers along WP&L's 38-mile Castle Rock-Wautoma line would be incidentally benefited by the construction necessary to service the Lakehead pumping station.